1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

10

BOBBY D. SANCHEZ, *et al.*,

Plaintiffs,

11

v.

12

13

BARBARA K. CEGAVSKE, in her official
capacity of Secretary of State for the State
of Nevada, *et al.*,

14

Defendants.

15

Case No. 3:16-cv-00523-MMD-WGC

ORDER

(Pls.' Motion for Preliminary Injunction –
ECF No. 26.)

16
17

**I.    SUMMARY**

18

Plaintiffs bring this action to challenge the alleged abridgment of a fundamental

19

right—the right to vote and in particular, to have equal access to early in-person voting

20

and election day in-person polling—protected under Section 2 of the Voting Rights Act.

21

Before the Court is an emergency Motion for Preliminary Injunction ("Motion") filed by

22

Plaintiffs Bobby D. Sanchez, Vinton Hawley, Johnny Williams Jr., Robert James, and

23

Ralph Burns. (ECF No. 26.) The Motion seeks preliminary relief from three defendants,

24

Barbara K. Cegavske, the Nevada Secretary of State[1], Washoe County, and Mineral

25

26

27

28

---

[1]The Secretary asserts that she is not a proper party. (ECF No. 37 at 5-6.)
However, NRS § 293.124 states that the Secretary of State "shall serve as the Chief
Election Officer of this State . . . [and in that capacity] is responsible for the execution
and enforcement of the provisions of title 24 of NRS and all other provisions of state and
federal law relating to elections in this State." At this early stage of the proceedings, the
Court cannot find that the Secretary is not a proper party.

County.[2] Defendants have each filed responses opposing Plaintiffs' request. (ECF Nos. 37, 38, 39.) Plaintiffs filed three respective replies. (ECF No. 44, 45, 46.) The Department of Justice, Civil Rights Division, pursuant to 28 U.S.C. § 517, filed a notice of interest on behalf the United States for the limited purpose of clarifying the legal standard under Section 2 of the Voting Rights Act ("VRA"). (ECF No. 43.)

The Court heard oral argument on September 4, 2016. (ECF No. 55.) The Court admitted certain of Plaintiffs' exhibits, and provisionally admitted Plaintiffs' Exhibits ("Ex" or "Exs.") 29, 30, 31, 32, 58, 59, 60 and 61 over Defendants' objections. (*Id.*)

For the reasons discussed below, the Motion is granted in part and denied in part. The Motion is granted with respect to Plaintiffs' request for early in-person voting in Nixon and Schurz. The Motion is also granted with respect to Plaintiffs' request for election day in-person voting in Nixon. The Motion is denied with respect to Plaintiffs' request for in-person voter registration in Nixon and Schurz.

## II.    BACKGROUND

### A.    Plaintiffs' Claims

Plaintiffs, members of the Pyramid Lake Paiute Tribe ("PLPT") and Walker River Paiute Tribe ("WRPT") , brought this suit under Section 2 of the Voting Rights Act ("Section 2"), the Equal Protection Clause of the Fourteenth Amendment, and the Nevada Constitution. (ECF No. 10 at 28-30.) Plaintiffs are registered voters and reside in either Schurz (WRPT's capitol) or Nixon (PLPT's capitol), except for Plaintiff Hawley who resides in Wadsworth (ECF No. 57) and Plaintiff James who resides about eight miles north of Wadsworth.

///

///

---

[2]The Amended Complaint also lists Washoe County Commissioners Marsha Berkbigler, Bob Lucey, Kitty Jung, Vaugn Hartung, and Jeanne Herman; Mineral County Commissioners Nancy Black, Paul MacBeth and Jerrie Tipton; Mineral County Clerk-Treasurer Christopher Nepper; and Washoe County Registrar of Voters Luanne Cutler, all in their official capacities. For the purposes of this order the Court assumes these defendants, in their official capacities, are subunits of Washoe County and Mineral County.

Plaintiffs allege that Defendants' failure to provide in-person voter registration, early voting, and election day polling locations on their reservations' capitols in Washoe and Mineral counties—where most of their members reside—amounts to unlawful burdens on PLPT and WRPT members' right to vote. (*Id.*) Plaintiffs request an injunction requiring Defendants to open an additional in-person registration site in Nixon and Schurz, an additional early polling location in Nixon and Schurz, and an additional election day polling location in Nixon. (ECF No. 26 at 9.)

## B.    Voting in Nevada

Nevada voters may register for the November 2016 elections in person at certain designated locations, by mail, or online until October 8, 2016. Between October 9 and 18, voters may only register in person. (ECF No. 38 at 5 (citing NRS Chapter 293).) Online registration requires a driver's license or ID issued by the Nevada Department of Motor Vehicles. A tribal identification card is not sufficient for online registration. (ECF No. 26 at 9.)

Nevada adopted in-person early voting in 1993. (ECF No. 38 at 5.) In passing early voting legislation, the Nevada Legislature intended to make voting more accessible to more people, increase participation, make voting more convenient, allow more accurate and efficient ballot counts, reduce administrative costs, and create a more informed and thoughtful electorate. (*Id.* (citing Legislative History of SB 250 (1993)).)

County clerks are charged with establishing criteria for the location of both permanent and temporary early polling locations. NRS § 293.3561. The clerk must then publish and distribute the locations, dates, and hours of operation for early polling locations at least one week prior to the early voting period. NRS § 293.3576. The Secretary of State must approve security provisions for early voting, and the county is responsible for securing voting machines during the early voting period. NRS § 293.3594.

Election day polling locations are governed by NRS §§ 293.270 – 293.307. These provisions do not set out criteria for establishing the location of polling places, but as

1
2
3

Washoe County points out, locations are subject to practical limitations such as ADA compliance, internet availability, size, and consent of the property owners. (ECF No. 38 at 7-8.)

4

### C.    Washoe County

5
6
7
8

Washoe County's Registrar of Voters assumes the election duties imposed on the county clerk by state law. (ECF No. 38 at 4.) The Registrar's Office is located in Reno and has six full time employees. (*Id.*) The Registrar's Office is the sole in-person registration location in Washoe County after October 8. (*Id.* at 5.)

9
10
11
12
13
14
15
16

The only permanent early polling location in Washoe County is the Registrar's Office, however Washoe County also operates 21 other temporary early polling locations. (ECF No. 38-1 ¶¶ 8, 9.) The only practical difference between the permanent and temporary locations is the permanent location's hours are governed by statute while Washoe County has discretion over the hours of the temporary locations. (*Id.*) The early voting locations are spread throughout Reno, Sparks, Incline Village, and Sun Valley. (ECF No. 38-2.) All but one early polling location are located in the same places they were during the 2016 primary. (ECF No. 38-1 ¶ 10.)

17
18
19
20
21
22
23

The Pyramid Lake Paiute Reservation is located northeast of Reno, and spreads across three Nevada counties, including Washoe. (ECF No. 11 ¶ 6.)[3] The tribal capitol is located in Nixon, a town approximately 48 miles from the Washoe County Registrar's Office in Reno. (Id. ¶ 10.) The nearest early voting location is located in Spanish Springs, which is approximately 32 miles away. (ECF No. 38-1 ¶ 12.) There is one election day polling location on the reservation, at the Natchez Elementary School in Wadsworth, which is about 16 miles from Nixon. (Id. ¶¶ 15, 16.)

24

///

25

///

26
27
28

_____

[3]Portions of Bret Healy's September 11, 2016 affidavit seem to be based on citations to Wikipedia rather than personal knowledge. The Court cannot rely on such assertions. *See, e.g, Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 977 n. 19 (C.D. Cal. 2010) (collecting cases in which courts note that the website is not a sufficiently reliable source on which to rest judicial findings).

4

### D. Mineral County

Mineral County is a sparsely populated rural county. The Clerk-Treasurer of Mineral County is responsible for carrying out the requirements of the state election code. (ECF No. 40 ¶ 1.) The only in-person registration and early voting location in Mineral County is located in Hawthorne, the county seat. (Id. ¶ 3; ECF No. 11 ¶ 22.)

The Walker River Paiute Reservation is located north of Hawthorne. The town of Shurz, the only town on the reservation, is approximately 35 miles from Hawthorne. (ECF No. 11 ¶ 22.) Mineral County runs election day polling locations in both Hawthorne and Schurz. (ECF No. 40 ¶ 2.)

## III.    LEGAL STANDARD

"'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 20. Alternatively, in the Ninth Circuit, an injunction may issue under a "sliding scale" approach if there are serious questions going to the merits and the balance of hardships tips sharply in the plaintiff's favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). The plaintiff, however, must still show a likelihood of irreparable injury and that an injunction is in the public interest. *Id.* at 1135. "[S]erious questions are those 'which cannot be resolved one way or the other at the hearing on the injunction.'" *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 926-27 (9th Cir. 2003) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Marcos*, 862 F.2d at 1362 (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

1    **IV.    DISCUSSION**

2          **A.    Evidentiary Issues**

3          During the October 4 hearing, Plaintiffs offered the testimony of Bret Healy, a

4    consultant for the Native American voting rights nonprofit Four Directions. Healy

5    administered two surveys on PLPT and WRPT's reservations (collectively, "the

6    Reservations") and compiled summaries of the results. He has also offered testimony in

7    support of the Motion via an affidavit. Defendants object to Healy being qualified as an

8    expert under Rule 702. They further object to reliance on the surveys, which they argue

9    contain hearsay and are biased and methodologically unsound.

10         "Due to the urgency of obtaining a preliminary injunction at a point when there has

11   been limited factual development, the rules of evidence do not apply strictly to

12   preliminary injunction proceedings*." Herb Reed Enterprises, LLC v. Florida*

13   *Entertainment Management, Inc.*, 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013). The Court

14   will address Defendants' evidentiary objections in the context of the more relaxed

15   application of the Federal Rules of Evidence.

16                    **1.    Bret Healy's Testimony**

17         At the hearing, Plaintiffs sought to have Healy qualified as an expert in

18   establishing satellite voting sites, early in-person voting, and in-person voter registration

19   in Indian country. Defendants objected that Healy's testimony on those subjects would

20   simply amount to legal conclusions about the application of Section 2. The Court allowed

21   Healy to testify but deferred ruling on Plaintiffs' request to qualify him as an expert.

22          Rule 702 permits witnesses to offer opinions if their specialized knowledge will be

23   helpful, the testimony is based on sufficient facts or data, the testimony is based on

24   reliable principles and methods, and the expert has reliably applied those standards and

25   methods. Rule 702 requires that "[e]xpert testimony ... be both relevant and reliable.

26   *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014). "The

27   determination whether an expert witness has sufficient qualifications to testify is a matter

28   ///

1    within the district court's discretion." *United States v. Garcia*, 7 F.3d 885, 889 (9th
2    Cir.1993) (citation omitted).

3         Healy offered testimony about his extensive experience helping various tribes
4    register to vote and establish early and satellite voting locations in Indian country. The
5    Court agrees that Healy's depth of experience may qualify him as an expert on
6    registering and helping tribal members to vote. *See id.* at 889-890 (Where a witness has
7    extensive experience working in a particular field, the witness's "lack of particularized
8    expertise in one aspect of that field, "goes to the weight accorded" his expert testimony,
9    not its admissibility.). However, it is not necessary to qualify Healy because for the
10   purposes of deciding the Motion the Court need only rely on Healy's testimony as a fact
11   witness. Healy's survey results summaries are based on simple arithmetic, and his
12   observations about the interactions between the tribes and state and county government
13   are based on personal experience.

14                    **2.    Surveys**

15        Plaintiffs offer two surveys (collectively, "the Surveys") in support of their Motion.
16   The first survey was developed for the Native American Voting Rights Coalition
17   ("NAVRC") by Professor Jean Schroedel of Claremont Graduate University ("the August
18   Survey"). (Exs. 51, 58, 59.) The August Survey was administered on reservations across
19   several states, including Nevada. The second survey was developed by Healy himself
20   and distributed on the Reservations in September ("the September Survey"). (Exs. 60,
21   61.)

22        Defendants contend that the Surveys are a form of hearsay and suffer from self-
23   selection bias. They also argue that the September Survey contains a number of
24   problematic questions, which might elicit biased answers.

25        Courts have long held that methodologically sound survey evidence is either not
26   hearsay or falls within one of several hearsay exceptions. *See, e.g.*, *Zippo Manufactoring*
27   *Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670, 682-83 (S.D.N.Y. 1963). The Ninth Circuit
28   is no exception. In *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

618 F.3d 1025, 1036 (9th Cir. 2010), the Ninth Circuit explained, "[w]e have long held that survey evidence should be admitted as long as [it is] conducted according to accepted principles and [is] relevant." Defendants' hearsay objection is therefore overruled.

Defendants' concerns about biased questions and self-selection in sampling have some merit. However, as the *Fortune Dynamic* court went on to say, "technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id*. (internal citations and quotes omitted).

The Court acknowledges that the Surveys, as with any voluntary study, are susceptible to self-selection problems. However, Defendants have not shown, nor does the Court see, how self-selection in this instance would produce a sample population that did not reflect that larger study population. Any self-selection problem would also seem to be lessened by the fact that participants were paid $10 or $15 to complete the survey questionnaire. Seemingly, a monetary incentive would help ensure that the Surveys were completed by anyone who wanted to make $15 in 20 minutes, rather than only those who wished to share a gripe against the country or state government. In this case, the sample was drawn from voting-age members of the PLPT and WRPT who resided on, or were present at, the respective reservations. The Court is not convinced that the voluntary nature of the Surveys or the incentives altered the sample pool in any meaningful way. Nonetheless, the Court will discount the probative value of both surveys and rely on them only in conjunction with other evidence. [4]

///

---

[4]During the hearing, Defendants also suggested that the incentive itself was reason to disregard the survey results. But incentives, including cash incentives, are a widely used part of commercial and academic survey research. *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, FEDERAL JUDICIAL CTR. 245, 263 (3rd ed. 2011); *see also* Eleanor Singer & Cong Ye, *The Use and Effects of Incentives in Surveys*, 645 ANNALS AM. ACAD. POL. & SOC. SCI. 112, 112-141 (2013) (monetary incentives are common in face-to-face surveys, produce higher response rates, and generally effect sample composition by drawing more people who would not otherwise participate).

Additionally, the Court agrees with Defendants that aspects of the September Survey make it even less reliable. The September Survey was drafted and administered by Healy, who is admittedly not an expert in survey research. (*See* ECF No. 11-25.) Generally, experts who design, conduct, and analyze a survey should have extensive training in the social sciences which includes methods, sampling, and statistics work.[5] The Court also agrees that some questions from the September Survey are worded in such as a way as to undermine the usefulness of the results.[6] The Court will afford less weight to the information derived from the September Survey, and afford no weight to the results from questions it deems confusing, prejudicial, or leading.

## B. Standing

Defendants argue Plaintiffs do not have standing to bring any of their claims. Defendants' standing objections with respect to early voting and election day polling locations are arguments against the merits of Plaintiffs' claims, rather than their standing to bring the claims in the first place.[7] However, Defendants' arguments about standing to bring Section 2 claims for in-person voter registration have merits.

Plaintiffs must have standing before bringing suit in federal court. *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004). Constitutional standing requires "(1) a threatened or actual distinct and palpable injury to the plaintiff; (2) a fairly traceable causal connection between the injury and the defendant's challenged conduct; and (3) a substantial likelihood that the requested relief will redress or prevent the injury." *Hong*

---

[5]Diamond, *supra* at 375.

[6]The Court is not concerned that these questions might taint the entire survey because the questions that will be given some weight are simple and not susceptible to suggestion. For example, question J asks if the respondent owns a car and if so how old the car is. (ECF No. 51-8.)

[7] Defendants also challenge Plaintiffs' standing based on the lack of allegations that they reside in either Nixon or Schurz. Plaintiffs offered evidence to fill this missing information. Because all but two Plaintiffs reside in either Nixon or Schurz, Defendants' standing challenge on this basis fails. *See Feldman v. Arizona Sec'y of State's Office*, CV-16-01065- PHX-DLR, 2016 WL 5341180, at *2 (D. Ariz. Sept. 23, 2016) ("Only one plaintiff needs to have standing when only injunctive relief is sought.") (citing *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008).

1   *Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987) (citations omitted).

2   Standing must exist as to each claim and cannot be "dispensed in gross*." Lewis v.*

3   *Casey*, 518 U.S. 343, 358 n.4 (1996); *see also Blum v. Yaretsky*, 457 U.S. 991, 999

4   (1982) ("[n]or does a plaintiff who has been subject to injurious conduct of one kind

5   possess by virtue of that injury the necessary stake in litigating conduct of another kind,

6   although similar, to which he has not been subject.").

7       Defendants Mineral County and Washoe County argue Plaintiffs have not

8   established an injury in fact regarding the claims for an additional in-person voter

9   registration site in their county because all Plaintiffs are registered voters. (ECF Nos. 39

10  and 40.) To demonstrate injury in fact, a plaintiff must show "an invasion of a legally

11  protected interest" that "affect[s] the plaintiff in a personal and individual way." *Lujan v.*

12  *Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs argue that without early voting

13  registration sites in Mineral County and Washoe County, they will not be able to update

14  their voter registration information, which allegedly constitutes injury in fact. (ECF No.

15  46.) However, Plaintiffs have not produced any evidence, via affidavit or otherwise, that

16  they need to update their voter registration. Nor does the Amended Complaint, as

17  currently written, clearly assert claims on behalf of an organization or group (i.e., PLPT

18  or WRPT) whose members might have standing based on problems with in-person voter

19  registration. *See Veasey v. Perry*, 29 F. Supp. 3d 896, 903 (S.D. Tex. 2014) (discussing

20  associational and representational standing for organizations).

21      Because all named Plaintiffs are registered voters, and because none have

22  shown a need to access in-person voter registration in order to update their registration,

23  Plaintiffs have failed to show injury in fact and thus do not have standing to assert the

24  claims for additional in-person registration sites. Therefore, Plaintiffs' request for a

25  preliminary injunction to establish in-person registration sites in Mineral County and

26  Washoe County is denied.

27  ///

28  ///

### C. Success on the Merits

Plaintiffs bring claims under Section 2, the Equal Protection Clause of the Fourteenth Amendment, and the Nevada Constitution. The Court finds they have demonstrated a likelihood of success on the Section 2 claim, and therefore an evaluation of the remaining claims is unnecessary.

Section 2 prohibits states from imposing any voting qualification that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). A violation of Section 2 is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class, "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b). "Although proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results…proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012), *aff'd sub nom.*

Courts evaluating a Section 2 claim generally go through a two-step analysis. First, the court determines whether the challenged voting practice imposes a disparate burden on the electoral opportunities of minority as compared to nonminority voters. Second, the court asks whether the burden works in tandem with historical, social, and political conditions to produce a discriminatory result. *See Feldman*, 2016 WL 5341180, at *3–4 (quoting *League of Women Voters of N. C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), *stay granted,* 135 S. Ct. 6 (2014), *cert. denied,* 135 S. Ct. 1725 (2015) (internal quotations and citations omitted)).

In evaluating the first question, the Court must account for both the likelihood that minority voters will face a given burden and their relative ability to overcome the burden. In other words, the Court must acknowledge the reality that a burden that may be

insignificant to one demographic may be great for another. *See League of Women Voters*, 769 F.3d at 245. In evaluating the second question, courts are guided by a non-exhaustive list of factors identified by the Senate Report on the 1982 amendments to the VRA. *Gonzalez*, 677 F.3d at 405. Many of these factors are relevant to cases involving vote dilution due to the drawing of district lines. *See Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (factors are often pertinent to vote dilution claims in particular). A few are also relevant in a case like this, where the claim is based on impediments to casting a ballot in the first place. Here, the relevant Senate Factors for the Court to consider are:

> [T]he extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

> [and]

> whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

S. Rep. No. 97-417, at 28-29. These factors are "neither comprehensive nor exclusive" and "other factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45.

Both parties, and indeed some courts applying Section 2 to cases involving barriers to voting rather than vote dilution, misstate the standards of the VRA. For example, the parties dispute whether Native Americans have ever been elected to local office. Additionally, Defendants argue that Plaintiffs must show they are unable to elect their preferred candidates, and have suffered discrimination at the hands of Defendants (rather than generally or historically). None of these elements are required in a Section 2 claim like this one.

In a case concerning abridgement of the right to vote through burdens that fall disproportionately on a protected class, "[a]ny abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to

influence the outcome of an election." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991). That abridgement becomes a violation of the VRA if "under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Id.* Thus, if Plaintiffs can identify a practice that abridges their ability to participate in an election, they need not also show that they cannot or have not elected representatives of their choice. Nor must they show that they have been discriminated against, specifically, by Defendants themselves.[8] *See United States v. Blaine Cty.*, 363 F.3d 897, 913 (9th Cir. 2004).

Plaintiffs have alleged that members of their tribes make up a sizeable population of minority voters who have fewer opportunities and greater difficulty than nonminority voters reaching polling locations. The difficulties are caused by travel distances, socioeconomic disparities limiting the ability to travel, and the costs involved in attempting to overcome such hurdles. Plaintiffs further allege that these difficulties are and related to and worsened by discrimination and its lingering effects. Thus, according to Plaintiffs, the current location of polling locations interacts with social and historical conditions to cause inequality in the opportunities for members of PLPT and WLPT to exercise their right to vote. These allegations state a claim for a violation of Section 2, and if supported by evidence may provide the basis for issuing a preliminary injunction.

### 1.    Early Voting

As an initial matter, Defendants' argument that Plaintiffs' ability to vote by mail undermines their claims with respect to early voting is misplaced. Plaintiffs do not have to show that they are unable to vote at all, only that the identified burdens fall disproportionately on them. The Nevada Legislature, the Secretary of State, and the Counties themselves all make clear that the point of in-person early voting is to make it easier for Nevadans to cast their ballots and thereby increase participation in elections.

---

[8]The Court appreciates Defendants' emphasis on the reasons for their decisions—compliance with state law and budget constraints, among other reasons—but the fact that Defendants themselves do not have any discriminatory motive is irrelevant here.

(*See, e.g.*, ECF No. 38 at 5.) If the ability to cast an in-person early vote is distributed in such a way as to only make it easy in places that are majority White, then Plaintiffs face an abridgement that is not faced by the majority. Section 2 requires that political processes be "equally open" to minority voters. 52 U.S.C. § 10301(b). Unequal access can be achieved by giving only majority voters preferred access to the polls just as it can be achieved by giving only minority voters extra burdens. In other words, if the county is going to adopt a practice making it easier for its residents to vote, protected classes under the VRA must share in the benefit of that practice.

To be sure, this does not require the Counties to have intentionally placed early polling locations only in majority White areas. The laudable utilitarian goal of maximizing voter participation by making it as easy as possible for as many as possible to vote can sometimes be in tension with the goal of ensuring that protected minority classes have equal access to the ballot. This is especially true when communities are racially segregated. But in passing the VRA and other civil rights protections, Congress made a choice to accept certain costs in exchange for the guarantee that minorities would be able to fully participate in civic life.

### a.    Washoe County

In support of their allegation that that they do not have equal access to early voting, Plaintiffs have produced several pieces of evidence, much of it undisputed at this stage. It is clear that the population of Nixon and the surrounding area is majority Native American. (ECF No. 26 at 12 (citing U.S. Census QuickFacts, www.census.gov/quickfacts).) It is also clear that the population of Reno, Sparks, and Incline Village is majority White. (*Id.*) The nearest early polling location to the PLPT Plaintiffs is located in Spanish Springs, which is approximately 32 miles away from Nixon, making a trip to early vote a 64-mile endeavor. (ECF No. 38-1 ¶ 12.)

According to a preliminary expert report from Professor Daniel Craig McCool of the University of Utah ("McCool Report" or "the Report"), there is a considerable body of research that supports the intuitive notion that the greater the distance a voter has to

1    travel to the polls, and the more impediments to travel, the less likely that voter is to vote.

2    (ECF No. 10-1 at 9.)

3         The Court also considers factors unique to PLPT that affect relative ability to

4    overcome the burden. The Tribal Council of the Pyramid Lake Paiute Tribe passed

5    resolution number PL 70-16 on September 6, 2016. ("PLPT Resolution"). (ECF No. 10-

6    2.) The PLPT Resolution asserts that PLPT members have limited access to

7    transportation and prefer to vote on reservation due to discrimination they experience off

8    reservation. (*Id.* at 2.) The August Survey shows that a quarter of tribal members felt

9    discriminated against or intimidated when leaving the reservation to either register or

10   vote in person. (ECF No. 49-5 at 2.) The September Survey shows that about 11% of

11   voting age tribal members do not own a car and an additional 25% have concerns about

12   their vehicle's reliability. (ECF No. 51-7 at 3.)[9] The McCool Report also notes that the

13   Native American population in Nixon has less wealth, lower incomes, and a higher

14   poverty rate than state and national averages. (ECF No. 10-1 at 14-15.) The Report

15   confirms what common sense dictates: travel is a larger burden to those with less

16   money. (*Id.* at 15.) These characteristics make the distances to polling places especially

17   burdensome to the PLPT Plaintiffs.

18        The Court finds that the distance Plaintiffs must travel and the associated costs

19   are a material limitation that bears more heavily on members of PLPT, especially given

20   their relative difficulty in accessing transportation, affording travel, and experience off

21   reservation discrimination and intimidation. Next the Court must determine whether the

22   burden works in tandem with historical, social, and political conditions to produce a

23   discriminatory result. This analysis incorporates the relevant Senate Factors and any

24   other factors that Court finds probative.

25   _____

26   [9]The Court finds the questions about car ownership unproblematic and therefore
     affords the results gleaned from them some weight here, though the Court is mindful the
     September Survey as a whole must be afforded less weight than other evidence. The
27   results are somewhat consistent with the numbers from the American Community
     Survey cited in the McCool Report – which show 6% of Nixon residents do not own a
28   vehicle, but does not limit the population to voting age tribal members. (ECF No. 10-1 at
     9.)

The McCool Report recounts the history of the Paiute tribe in Nevada. (ECF No. 10-1 at 11-12.) The history is characterized by conflict between the Paiute and White settlers over land and water. (*Id.*) The Report also notes that Nixon has a significantly higher proportion of residents who are not in the work force, a lower median household income, lower high school graduation rate, lower rates of health insurance and a higher poverty rate than other locations in Washoe County – many of these statistics also compare unfavorably with national averages. (*Id.* at 14-16.) Plaintiffs also point to more widely known events in U.S. history that have affected the Paiutes and tribes across the country, such as the Dawes Act and the Indian Citizenship Act.[10] (ECF No. 28 at 2-28.) The Secretary of State implies that disparities in welfare between Native Americans and other Nevadans are partially a result of the choice to live on remote tribal reservations. (ECF No. 37 at 12.) This argument, which assumes that the geography of the tribal reservations is ahistorical and apolitical, ignores a long and well documented history.[11] The geographic isolation of tribal members is not an accident or a choice, it is the clear product of "social and historical conditions." *See League of Women Voters*, 769 F.3d at 240. In this instance, it is clear that geographic isolation works in tandem with the placement of early voting polling locations to further isolate the PLPT Plaintiffs from the political process.

Lastly Plaintiffs presented limited evidence that the state has been unresponsive to their particularized needs, especially in the context of elections. First, a tribal ID is insufficient to register online as a first time voter, which requires tribal members who reside on reservations to travel to a DMV and purchase either a driver's license or a state ID. Second, the Secretary of State informed Plaintiffs that it had not taken, and was

///

___

[10] *See also Securing Indian Voting Rights*, 129 Harv. L. Rev. 1731 (2016);  Marc Slonim, *Indian Country, Indian Reservations, and the Importance of History in Indian Law*, 45 Gonz. L. Rev. 517 (2009); Willard Hughes Rollings, *Citizenship and Suffrage: The Native American Struggle for Civil Rights in the American West, 1830-1965*, 5 Nev. L.J. 126 (2004).

[11] *See id.*

1  not aware of, any efforts to investigate problems Native Americans on Nevada

2  reservations had experienced. (ECF No. 26 at 28.)

3  The Court finds that the PLPT Plaintiffs have shown a likelihood of success on

4  their Section 2 claim as it relates to an in-person early voting polling location.

5  **b.  Mineral County**

6  As with the claims against Washoe County, many of the facts supporting the

7  claims against Mineral County are undisputed at this stage. The only in-person early

8  voting location in Mineral County is located at the county seat in Hawthorne. (ECF No.

9  40-1 ¶ 3.) Hawthorne is majority White. (ECF No. 26 at 12 (citing U.S. Census

10  QuickFracts, www/census.gov/quickfacts).) Schurz is the second largest city in Mineral

11  County and the only city located on the Walker River Indian Reservation. It is majority

12  Native American. (*Id.*) The distance between Schurz and Hawthorne is 34 miles, making

13  a trip to early vote in person a total of 68 miles. (ECF No. 10-1 at 9.)

14  The distance the WRPT Plaintiffs must drive to vote early in-person is similar to

15  the PLPT Plaintiffs and is a material burden for the same reasons. WRPT members face

16  even more acute disadvantages than PLPT members in overcoming that burden. The

17  unemployment rate in Schurz is about 35.4% and the percentage of people making less

18  than $10,000 a year is about 25%. In Hawthorne, the unemployment rate is 6.7% and

19  the percentage of people making less than $10,000 a year is 4.1%. (*Id.* at 14-15.) The

20  September Survey shows that about 18.5% of voting age WRPT members do not own a

21  car and about 28% have concerns about their car's reliability. (ECF No. 49-8 at 2.)

22  These unique aspects of the WRPT make the 68-mile roundtrip burden particularly

23  difficult.

24  The Court finds that the burden works in tandem with historical, social, and

25  political conditions to produce a discriminatory result for the WRPT Plaintiffs for the

26  same reason it does for the PLPT Plaintiffs.

27  ///

28  ///

17

1  Therefore, the Court finds that the WRPT Plaintiffs have demonstrated a

2  likelihood of success on their Section 2 claim related to in-person early voting polling

3  location.

4  ### 2.  Washoe County Election Day Polling Location

5  Washoe County runs an election day polling location at Nanchez Elementary

6  School in the city of Wadsworth. This is the only location on the Pyramid Lake Paiute

7  Reservation. (ECF No. 38-1 ¶ 16.) Wadsworth is approximately 16 miles from Nixon, and

8  sits near the southernmost point of the Reservation. A round trip for a Nixon voter on

9  election day is therefore about 32 miles, and a roundtrip for any voter north of Nixon is

10  even further.

11  The Court's reasoning in regards to early in-person voting also applies to same

12  day voting. The difference here is the distance. Though the burden is undoubtedly less,

13  it is not immaterial, especially when considering conditions particular to the PLPT

14  Plaintiffs.[12] Furthermore, the shorter distance is somewhat offset by the fact that this

15  closer polling location is open for only one day, while the early voting location is open for

16  several days. Therefore, the Court finds the PLPT Plaintiffs have demonstrated a

17  likelihood of success on this claim as well.

18  ### D.  Likelihood of Irreparable Harm

19  It is clear that abridgement of the right to vote constitutes an irreparable injury.

20  See *Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837, 840 (N.D. Cal.

21  1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes

22  irreparable injury."); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It

23  is well established that the deprivation of constitutional rights 'unquestionably constitutes

24  irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Obama for Am.

25  v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to

26  ///

27  _____

28  [12]At least one of the PLPT Plaintiffs, Ralph Burns, lives in Nixon.

1
2
vote … constitutes irreparable injury.") (citing *Williams v. Salerno,* 792 F.2d 323, 326 (2d
Cir.1986)). Therefore this factor weighs in favor of a preliminary injunction.

3
### E. Balance of Hardships

4
5
6
7
8
9
Mineral County estimates the costs of providing additional in-person voter registration and early voting would amount to at least $4,777.48.[13] (ECF No. 40 at 6.) This amount represents about a third of Mineral County's total election budget. (*Id.*) Washoe County does not provide cost estimates, but argues generally that its resources are currently stretched to their limits and an injunction requiring them to plan and staff an additional voting site would be unfair. (ECF No. 38 at 26-27.)

10
11
12
13
14
The Court acknowledges the substantial costs that injunctive relief places upon the counties, especially at this late hour.[14] It is difficult, however, to balance a financial and logistical hardship with a burden on constitutional rights, especially when that burden is partially a result of financial constraints on Plaintiffs themselves. The Court finds this factor neutral.

15
### F. Public Interest

16
17
18
19
20
21
22
23
24
In the vote dilution and redistricting context, courts in this circuit have found that the public interest is generally served by allowing scheduled elections to move forward without delay rather than enjoining an election. *See, e.g., Cano v. Davis*, 191 F. Supp. 2d 1135, 1139 (C.D. Cal. 2001). In this case, while injunctive relief would impose costs upon Defendants, there is no indication it would interfere with the state's ability to move forward with the November election as scheduled. The public interest is served by the enforcement of the VRA and the inclusion of protected classes in the political process. See *League of Women Voters*, 769 F.3d at 247 ("By definition, the public interest ...
///

25
26
27
28
[13]Because the Court has ruled against Plaintiffs' request for in-person voter registration, this amount would presumably be less.

[14]Defendants suggest that Plaintiffs have been dilatory in bring the Motion. Plaintiffs counter that Defendants delayed in responding to their requests for voting access. As the Court explained during the hearing, the Court does not find that Plaintiffs have delayed to gain a strategic advantage.

favors permitting as many qualified voters to vote as possible.") (internal quotes omitted); *Spirit Lake Tribe v. Benson Cty.,* No. 2:10-CV-095, 2010 WL 4226614, at *5 (D.N.D. Oct. 21, 2010) ("[T]here simply is no more essential duty of a democratic government than to provide open, fair elections that are accessible to all eligible voters…In a representative republic, the right of the people to elect their representative is superior to concerns over the public purse."). Therefore, the Court finds that the public interest is served by a preliminary injunction.

## V.     CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Plaintiffs' Motion for Preliminary Injunction (ECF No. 26) is granted in part and denied in part. The Motion is granted with respect to Plaintiffs' request for early in-person voting in Nixon and Schurz. The Motion is also granted with respect to Plaintiffs' request for election day in-person voting in Nixon. The Motion is denied with respect to Plaintiffs' request for in-person voter registration in Nixon and Schurz.

DATED THIS 7th day of October 2016.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE